UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 4 WEST 21ST STREET OWNERS CORP., Plaintiff, -v- BREM REALTY, LLC, Defendant. | 25 Civ. 7173 (JPC) OPINION AND ORDER |

JOHN P. CRONAN, United States District Judge:

Plaintiff 4 West 21st Street Owners Corp. alleges that its landlord, Defendant BREM Realty, LLC, breached both the express terms of the parties' lease and the implied covenant of good faith and fair dealing. Plaintiff rents land from Defendant under a ninety-nine-year lease, which regularly recalculates the rent that Plaintiff must pay based on the land's fair market value ("FMV"). The lease also provides a framework for calculating that FMV: the parties must each submit an appraisal that considers all relevant factors, and if they cannot agree on an FMV, they must allow a neutral arbitrator to choose between their competing valuations.

Plaintiff asserts that Defendant breached this provision by providing an appraisal that failed to consider all of the relevant factors. It therefore asks the Court to stay or enjoin arbitration pending the outcome of this lawsuit. Meanwhile, Defendant moves to dismiss, or alternatively to stay this litigation pending arbitration. For the following reasons, the Court agrees with Defendant, dismisses the Amended Complaint with prejudice, and denies Plaintiff's motion as moot.

## I. Background

### A. Facts[1]

This dispute centers on the land stretching from 4 to 10 West 21st Street in New York City (the "Land"). Am. Compl. ¶ 24. That Land lies in the "Ladies' Mile Historic District," which takes its name from a "fashionable row of department stores . . . where women routinely shopped" in the nineteenth century, and which features classic examples of New York City architecture—including "several . . . early skyscrapers." *Id.* ¶¶ 26-27. To "safeguard [the neighborhood's] historical and architectural integrity," the Landmarks Preservation Commission of New York City (the "LPC") has promulgated several "building restrictions and regulations." *Id.* ¶ 29. These restrictions do not, however, foreclose all new development; a builder may still erect a structure that uses "historically appropriate materials and designs" and matches "the existing historic streetscape." *Id.* ¶ 31.

Following these rules, Plaintiff's predecessor-in-interest constructed a seventeen-story building—which "contain[s] 53 residential units, a retail space, and a 105-car subterranean parking garage" (the "Building")—on top of the Land. *Id.* ¶ 25. But Plaintiff, a cooperative housing corporation, does not actually own the underlying plot; instead, it rents the Land from Defendant BREM Realty, LLC, under a ninety-nine-year lease whose term began in 2000 (the "Lease" or the "Ground Lease"). *Id.* ¶¶ 6, 13; *see* Dkt. 26 ("Whitney Decl."), Exh. A ("Lease"). Every year, this Lease "recalculate[s]" the amount of rent that Plaintiff must pay, using a series of sometimes-complex formulae that change depending on the year at issue. Am. Compl. ¶¶

[1] The Court derives these facts from the allegations in the Amended Complaint, Dkt. 10 ("Am. Compl."), which it accepts as true, *see Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009), and from the parties' lease and the appraisers' reports, which the Amended Complaint "incorporate[s] by reference," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

38-44. As relevant here, the rent calculations for the twenty-sixth year of the Lease (*i.e.*, May 2025 to April 2026) and several later years rely in large part on the appraised FMV of the Land. *Id.* ¶¶ 40-44.

Section 3.3.2 of the Lease explains how the parties will calculate this FMV. Each party must begin by "appoint[ing]" its own "broker and/or appraiser." Lease at 13; *accord* Am. Compl. ¶ 46. These appraisers then propose respective FMVs after "consider[ing] all relevant factors . . . including, but not limited to, the size of the Land, the length of the applicable period, the lack of escalations, and the actual and all permitted uses of the Land." Lease at 13; *accord* Am. Compl. ¶ 51. If these suggested FMVs diverge, the parties must go through a simple, two-step arbitration process. Lease at 13; *accord* Am. Compl. ¶¶ 53-55. First, the parties must "agree upon and appoint a third, fair and unbiased" appraiser, with the President of the Real Estate Board of New York, Inc. choosing a default appraiser if the parties cannot come to a consensus. Lease at 13; *accord* Am. Compl. ¶ 53. Second, that appraiser must choose between the two possible FMVs that the parties have presented. Lease at 13; *accord* Am. Compl. ¶ 54. That choice ends the arbitration, and "shall be final and binding upon the parties." Lease at 13; *accord* Am. Compl. ¶ 55 (internal quotation marks omitted).

The parties began this appraisal process in 2024. Am. Compl. ¶ 57. As its appraiser, Plaintiff chose Sharon Locatell of Appraisers and Planners Inc., while Defendant selected Marc J. Nakleh of Cushman & Wakefield. *Id.* ¶¶ 58-59. These appraisers arrived at significantly different estimates of the Land's FMV; Nakleh's report valued the Land at approximately $33,000,000, while Locatell's report concluded that it was worth roughly $14,500,000. *See* Whitney Decl., Exhs. B ("Nakleh's Report"), C ("Locatell's Report"); Am. Compl. ¶ 64. This multimillion-dollar gap has significant stakes: because the Lease's rent-calculation provisions

depend in part on the Land's appraised FMV, the choice between the two possible appraisals could swing Plaintiff's future rent obligations by hundreds of thousands of dollars. Am. Compl. ¶¶ 65-69.

Plaintiff objected to Nakleh's Report, and in July 2025 it "notified" Defendant that the Report "failed to comply with the terms of the Ground Lease and New York law" and "demanded that [Defendant] direct" Nakleh to revise it. *Id.* ¶ 94. Defendant disagreed, and on August 25, 2025, announced that it would move to the next step of the arbitration process—*i.e.*, appointing a neutral broker. *Id.* ¶¶ 100-101.

**B. Procedural History**

On August 28, 2025, Plaintiff filed its Complaint, Dkt. 1, which it amended on September 4, 2025, Dkt. 10. Relying on this Court's diversity jurisdiction, Am. Compl. ¶¶ 19-21, the Amended Complaint asserts causes of action for breach of contract, *id.* ¶¶ 102-113 ("Count One"), breach of the covenant of good faith and fair dealing, *id.* ¶¶ 114-120 ("Count Two"), and declaratory judgment, *id.* ¶¶ 121-127 ("Count Three"). In Count One, Plaintiff alleges that Defendant breached the Lease "by failing to provide an appraisal" that considered relevant factors related to "all encumbrances" on the Land, *id.* ¶ 107 (internal quotation marks omitted), and by "refus[ing] on August 25, 2025, to instruct its appraiser to comply with the terms of the Ground Lease and New York law," *id.* ¶ 108. In Count Two, Plaintiff similarly alleges that Defendant beached the implied covenant by "refus[ing] to direct its appraiser to consider the factors expressly set forth in the Ground Lease and New York law, and instead decid[ing] to stand by an appraisal report that expressly refuses to do so." *Id.* ¶ 116. And in Count Three, Plaintiff seeks a declaration that Defendant's "appraisal does not conform to the requirements of the Ground Lease and New York law and, therefore, is null and void and,

therefore [Plaintiff's] appraisal shall alone be used to determine the FMV and 26th Year Appraised Rent, and the arbitration should be stayed or enjoined." *Id.* ¶ 127. In addition to that declaratory judgment, the Amended Complaint seeks "specific performance, requiring [Defendant] to supply an appraisal that complies with the Ground Lease and New York law." *Id.* ¶¶ 113, 120; *accord id.* at 19.

More specifically, the Amended Complaint spells out two alleged problems with Nakleh's Report. First, it asserts that the Report did not consider how the "the [G]round [L]ease *itself*" might affect the value of the underlying Land—including the Lease's "obligation to continue to pay the ground rent during the term of the Ground Lease; future rent resets in accordance with the terms and procedures set forth in the Ground Lease; the term of the Ground Lease itself, which expires in 2099; and the lack of a reversion associated with the expiration of the Ground Lease that lacks extension options." *Id.* ¶ 75 (emphasis added). Second, the Amended Complaint alleges that Nakleh "failed to consider or make any adjustment to his calculations based on the location restrictions of the Land," which would make "[d]evelopment . . . more costly and lengthy compared to development in areas" not regulated by the LPC. *Id.* ¶¶ 88, 90.

On September 23, 2025, Plaintiff moved to stay or enjoin arbitration pending the outcome of this lawsuit. Dkt. 21-22, 23 ("Arbitration Stay Motion"). On September 30, 2025, Defendant responded by (i) moving to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, to compel arbitration and stay this action, Dkts. 24, 25 ("MTD"), 26; and (ii) opposing Plaintiff's motion for a stay of arbitration, Dkts. 27 ("Arbitration Stay Opposition"), 28. On October 3, 2025, Plaintiff replied in further support of its stay motion, Dkt. 30, and on October 21, 2025, it filed its

opposition to Defendant's motion to dismiss, Dkt. 33 ("MTD Opposition"). Finally, on October 28, 2025, Defendant replied in support of its motion to dismiss, Dkt. 34, thus closing out this lightning-round of briefing.

## II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[A] claim is plausible if the plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged' and establishes 'more than a sheer possibility that a defendant has acted unlawfully.'" *Knapp v. Barclays PLC*, 171 F.4th 166, 170 (2d Cir. 2026) (quoting *Iqbal*, 556 U.S. at 678). Furthermore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because courts are not bound to "accept as true . . . [a complaint's] legal conclusions." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). And because interpreting a contract requires just such conclusions, "a court [in a breach-of-contract case] is 'not constrained to accept the allegations of the complaint in respect of the construction of the [contact].'" *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).

## III. Discussion

To plead a breach of contract under New York law,[2] a plaintiff must show that a defendant violated its "contractual obligations." *EDW Drywall Constr., LLC v. U.W. Marx,*

[2] Both parties apply New York law in their briefs. *See, e.g.*, Arbitration Stay Motion at 13, 19-23; Arbitration Stay Opposition at 13-15; MTD at 8-12; MTD Opposition at 15-20.

*Inc.*, 135 N.Y.S.3d 204, 206 (3d Dep't 2020) (internal quotation marks omitted). And the scope of those obligations turns on the "unequivocal language" of the contract, which courts "interpret[] so as to give effect to the intention of the parties." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992).

Section 3.3.2 of the Lease requires each appraiser to "*consider* all relevant factors in making their determinations of [FMV]." Lease at 13 (emphasis added); *accord* Am. Compl. ¶ 51. In construing this provision, the Court looks both to (i) the plain meaning of the term "consider," *i.e.*, to "think about carefully" or "take into account," *Consider*, Merriam-Webster's Collegiate Dictionary 246 (10th ed. 1999); and (ii) guidance from the New York Court of Appeals. The Court of Appeals has explained that "[u]nless" the lease "express[ly] provi[des] to the contrary," calculations of FMV must weigh all "encumbrances" on the property being evaluated—including the "economic benefits or disadvantages created by the lease" itself. *936 Second Ave. L.P. v. Second Corp. Dev. Co.*, 891 N.E.2d 289, 292 (N.Y. 2008) (internal quotation marks omitted); *United Equities, Inc. v. Mardoric Realty Co.*, 187 N.Y.S.2d 714, 717 (1st Dep't 1959), *aff'd*, 165 N.E.2d 426 (N.Y. 1960). Here, the Lease here does not expressly provide that the parties should ignore its effects and any encumbrances when calculating the FMV of the underlying land. The appraisers thus needed to "consider" the Lease itself—in other words, to appraise the property as encumbered, and to "think about carefully" the Lease's effects.

---

Therefore, the Court applies New York law in resolving the cross motions. *See Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)).

That is exactly what Nakleh's Report did. The Report, which ran over one hundred pages, (i) quoted section 3.3.2 of the Lease; (ii) emphasized that the Lease does not "instruct[] [the appraiser] to value the site as if unencumbered"; and (iii) acknowledged that "if an item is not explicitly excluded from consideration, it must be included." Nakleh's Report at 7-8; *see also* Am. Compl. ¶ 78 (conceding that Nakleh's Report "recognized the need to take into account encumbrances under New York law"). Then, Nakleh's Report analyzed the effects of the Lease, explaining that "state law prohibits development of residential condominiums on ground leased sites," and that the Lease thus "significant[ly]" decreased the FMV of the Land because a hypothetical developer's inability to build profitable luxury condos—a hot commodity on West 21st Street—would make the Land less valuable. Nakleh's Report at 8.

Next, Nakleh's Report considered whether any other aspects of the Lease would meaningfully affect the FMV of the Land. In doing so, the Report made a significant judgment call: while Locatell's Report subtracted the rent due under the Lease from the Land's overall operating income, Locatell's Report at 128, Nakleh's Report declined to do so, explaining that "[t]he inclusion of ground rent in the valuation of the end development is not necessary given that the ground rent is in lieu of an up-front acquisition cost for the land, and associated loan payments," Nakleh's Report at 8. Put simply, Nakleh decided not to deduct rent from the net amount of money that the Land would bring in, because a hypothetical acquiror of the Land would not be on the hook *both* for acquisition costs *and* for paying the rent on the Land that it had just purchased.

Nakleh's Report also discussed LPC regulations, noting that "[d]ue to [the Land's] location within the Ladies' Mile Historic District, any external alterations of existing buildings or new development on the subject site would need to be approved by the [LPC]." Nakleh's

Report at 46. The Report did not, however, significantly alter its valuation based on this factor. *See id.* Finally, the Report acknowledged that the original builder had obtained a "special [LPC] permit" for the Building's garage, but concluded that this permission would not impact the value of the Land because "the permit did not require parking, and current zoning regulations do not require parking at the site." *Id.* at 46 n.12.[3]

Faced with these problems, Plaintiff points to three alleged defects in Nakleh's Report.[4] First, Plaintiff contends that the Report effectively ignored the Lease's rent provisions by failing to lower the appraised value because of the tenant's obligation to pay rent. MTD Opposition at 17. But Nakleh clearly "considered" the effect of the rent; indeed, as discussed above, he weighed that encumbrance carefully, before concluding that it would not meaningfully depress FMV. And while Plaintiff may believe that this conclusion was *mistaken*, an appraiser's error differs from his failure to *consider* a relevant factor at all. *Cf. Johnson v. Comm'r of Soc. Sec.*, No. 16 Civ. 180 (ATB), 2017 WL 120938, at *8 (N.D.N.Y. Jan. 11, 2017) ("[T]he term

[3] The Amended Complaint alleges that Nakleh's Report failed to consider the special permit, "which would negatively impact the Land value due to the costs to develop . . . a garage." Am. Compl. ¶ 92. But Nakleh's Report clearly *did* consider the permit, *see* Nakleh's Report at 46 n.12, and Plaintiff's briefing does not defend the Amended Complaint's allegations on this point. Furthermore, as discussed below, Plaintiff's own appraiser also chose not to reduce the FMV because of the permit. Locatell's Report at 87.

[4] Plaintiff also appears to argue, in passing, that the Court must address Defendant's alternative request to stay this litigation pending arbitration. *See* MTD Opposition at 7 ("[B]efore a court may reach the merits of a motion to dismiss made pursuant to Rule 12(b)(6), it must resolve questions, such as the arbitrability of a claim."). But Plaintiff itself has framed its claims as purely *legal* challenges involving the Lease's interpretation, which the Court can resolve by taking Plaintiff's allegations in its Amended Complaint at face value, not as a challenge to this Court's power to resolve those legal issues. *See* Arbitration Stay Motion at 11 ("[T]he legal issues presented in this case should be decided by this Court rather than a third-party broker."); *see also McDonald's Corp. v. Vanderbilt Atl. Holdings LLC*, No. 19 Civ. 6471 (DLI) (ST), 2020 WL 6481408, at *5 (E.D.N.Y. Sept. 30, 2020) (holding that challenges regarding "contract interpretation" in a dispute regarding appraisals did not fall within an arbitration clause), *aff'd,* 851 F. App'x 259, 260 (2d Cir. 2021) (same).

'consider' d[oes] not indicate that the [decision-maker] [is] required to make any particular finding.").

Second, Plaintiff insists that Nakleh's Report should have "considered the lack of a reversion associated with the expiration of the Ground Lease that lacks extension options or the length of the applicable period." MTD Opposition at 17. But Plaintiff's cursory (and confusing) argument does not explain why these factors are "relevant" or how they would affect the FMV. And in any event, the Court declines to read the Lease as requiring appraisers to robotically document every conceivable encumbrance that the other party might ultimately insist was relevant. Such an interpretation would allow the parties to manufacture a breach out of practically *any* report; after all, they would need only to assert that the opposing appraiser failed to record its responses to every subclause of the Lease. And that fragile conception of the parties' agreement would flout both their clear "intention" and the overarching structure of the "entire contract"—which clearly contemplates that the parties will arbitrate disputes about the accuracy of appraisals, without being able to disguise factual quibbles in legal garb. *Cruden*, 957 F.2d at 976.[5]

Finally, Plaintiff claims that Nakleh's Report should have concluded that LPC regulations depressed the FMV of the Land. While Plaintiff does not contest that the Report "acknowledg[ed]" these restrictions, MTD Opposition at 17, it disagrees with the Report's decision not to decrease the FMV, and it emphasizes that "[d]evelopment in a historic district is more costly and lengthy compared to development in areas not subject to such a designation," *id.* at 5 (quoting Am. Compl. ¶ 90). But that argument once again conflates an appraiser's duty

[5] Indeed, Plaintiff's own appraisal would seem to flunk its own maximalist test: when discussing the garage permit, Locatell explained that "we have NOT considered this encumbrance in our valuation analysis." Locatell's Report at 87.

to *consider* relevant factors with *how* he ultimately evaluates them. And Nakleh clearly weighed the Land's location and the existence of LPC regulations—even if his conclusions about those restrictions (allegedly) may have been incorrect. *See* Nakleh's Report at 46.

Perhaps sensing the weakness of all these arguments, Plaintiff makes one last-ditch effort to blur the line between an appraiser's "consideration" and his substantive decisions. According to Plaintiff, sometimes an appraiser can miss the mark by so much that a court must treat his flawed analysis of a factor as failing to "consider" it at all. In other words, Plaintiff contends that if an appraiser is free to "recognize" an encumbrance but nonetheless (wrongly) decide that it would have virtually no impact, the New York Court of Appeal's decision in *936 Second Avenue*—discussed above—"would be rendered without meaningful effect." MTD Opposition at 18 (internal quotation marks omitted).

But *936 Second Avenue*'s "common sense" merely requires appraisers to "examine [a lease's] effect[s]." 891 N.E.2d at 293. If an appraiser "ignore[s]," *id.* at 292, such effects, he will have violated New York law; but if he *mistakenly* minimizes them, he will have simply prepared a shoddy appraisal. *936 Second Avenue* is thus "meaningful" not because it outlaws garden-variety, sub-par appraisals—and opens the floodgates to litigation—but because it forces appraisers to confront a test that they might flunk (by presenting an appraisal that incorrectly evaluates an encumbrance). And the remedy for such an inaccurate appraisal lies not in abstract legal principles regarding breach of contract, but in concrete factual challenges; if Plaintiff is correct here, for instance, it may simply complain to the neutral arbitrator, who will be positioned to recognize the flaws, if any, in Nakleh's appraisal.

Plaintiff's implied-covenant claim fails for the same reasons. "A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the

implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (internal quotation marks omitted). Here, Plaintiff's implied-covenant claim essentially overlaps with its breach-of-contract one. *Compare* Am. Compl. ¶¶ 102-113, *with id.* ¶¶ 114-120. And even if some daylight exists between the claims, Plaintiff's implied-covenant argument still relies on the theory that Nakleh's Report did not "comply with the terms of the Ground Lease or New York law." *Id.* ¶ 116. Because the Court rejects that cornerstone premise, it must also dismiss the implied-covenant claim.

Finally, having dismissed Plaintiff's claims for breach of contract and breach of the implied covenant, the Court must also dismiss Plaintiff's declaratory judgment claim in Count Three for lack of subject matter jurisdiction. *See Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) ("Section 2201 provides no independent basis for subject matter jurisdiction."). Moreover, Plaintiff's declaratory judgment claim rests on the same flawed grounds as its breach claims. *See* Am. Compl. ¶ 127 (seeking "a declaration that [Defendant's] appraisal does not conform to the requirements of the Ground Lease and New York law").

## IV. Conclusion

For these reasons, the Court grants Defendant's motion to dismiss (and thus does not reach its alternative motion to compel arbitration and stay this action), dismisses the Amended Complaint without leave to amend,[6] and denies as moot Plaintiff's motion to stay or enjoin

[6] "Because [Plaintiff] has not requested leave to amend or explained how [it] would seek to cure the deficiencies in [the Amended Complaint], the Court does not grant leave to amend." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 284 (S.D.N.Y. 2025); *see Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [for leave to amend] that was not made.").

arbitration pending this lawsuit.[7] The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated: September 16, 2026
New York, New York

JOHN P. CRONAN
United States District Judge

[7] Plaintiff requests a stay of arbitration only until its claims in this action are resolved, which is done in this Opinion and Order. *See* Arbitration Stay Motion at 1 ("The Court has the inherent authority to grant such a stay until resolution of [Plaintiff's] claims pursuant to its authority to control its docket."); *accord id.* at 11. Similarly, Plaintiff's request for injunctive relief enjoining arbitration is moot given the Court's dismissal of its claims. *Id.* at 24 ("[F]orcing [Plaintiff] to continue with the appraisal process prior to a determination of the issues presented in the Complaint would be a waste of time and resources."). Moreover, Plaintiff has not shown a likelihood of success on the merits for the reasons discussed above.